EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CONFESOR MELÉNDEZ SANTOS, acusado y apelante.

Número 16208.

*Reasignado:* 2 de septiembre de 1958. *Resuelto:* 24 de octubre de 1958.

*Carlos J. Irizarry Yunqué* y *Jesús B. Rodríguez López,* abogados del apelante; *Hon. Secretario de Justicia J. B. Fernández Badillo, Arturo Estrella* y *William Fred Santiago, Fiscal* y *Fiscal Auxiliar respectivamente, del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

Confesor Meléndez Santos solicita revoquemos la sentencia de quince a treinta años de presidio impuéstale por el Tribunal Superior, Sala de Ponce, por un delito de asesinato en segundo grado. Sostiene que el tribunal de instancia incurrió en error al negarse a trasladar el caso para otra Sala del Tribunal Superior, al no ordenar se le juzgara separadamente de los otros dos coacusados en el caso, y al admitir en evidencia una declaración jurada y unas supuestas manifestaciones verbales suyas sin que se hubiera probado la voluntariedad de las mismas. Estimamos que es correcto el tercer planteamiento del apelante, y procede, por lo tanto, revocar la sentencia apelada. Por tal razón, y examinadas las circunstancias de este caso que pasamos a reseñar inmediatamente, no es necesario resolver las otras dos cuestiones.

El ministerio público acusó a Confesor Meléndez Santos, Francisco Soto Delgado y Hermenegildo Ramos Rivera de haberle dado muerte ilegal a Eulalia Toro Muñoz el 29 de mayo de 1955, en la carretera que conduce de Guayanilla a Ponce, sitio conocido como Salistral, "actuando en conjunto y de común acuerdo, con malicia premeditada, deliberación y con el propósito firme y decidido" de matar. Al llamarse el caso para vista el 14 de febrero de 1956, el juez de instancia denegó una solicitud de traslado (¹) y otra de juicio por separado (²) presentadas por Meléndez Santos. Se constituyó el

---

(¹) La solicitud de traslado se rige por el artículo 172 del Código de Enjuiciamiento Criminal (34 L.P.R.A. sec. 432) el cual provee que deberá hacerse "en sala de justicia, por escrito, y apoyarse en declaración jurada del acusado o del fiscal, según el caso, presentándose copia de la misma al abogado de la parte contraria, por lo menos un día antes de oírse la solicitud." En *Maldonado* v. *Corte*, 71 D.P.R. 537 (1950) explicamos el alcance de ese artículo y citamos con aprobación, entre otros, a *People* v. *Yoakum*, 53 Cal. 566 (1879).

(²) La concesión de un juicio por separado descansa en la sana discreción del tribunal—artículo 238 del Código de Enjuiciamiento Criminal (34 L.P.R.A. sec. 717), *Pueblo* v. *Muñiz*, 77 D.P.R. 851, 853 (1955); *Pueblo* v. *Ortiz*, 76 D.P.R. 257, 263 (1954); *Pueblo* v. *Clemente*, 35 D.P.R. 628 (1926); *Pueblo* v. *Arrocho*, 34 D.P.R. 847 (1926) confirmado en 16 F.2d 90, *cert. denegado*, 273 U.S. 760 (1926). No obstante, en varias jurisdicciones norteamericanas, e interpretando disposiciones similares a la nuestra, se ha impuesto al tribunal la obligación de ordenar un juicio

jurado y el fiscal comenzó a presentar su prueba luego de que los tres acusados habían hecho alegación de inocencia.

El testimonio médico probó que la víctima había muerto de una conmoción (*shock*) traumática y que tenía fracturas y laceraciones en el hueso fronto-parietal derecho y fracturas en tres costillas. Tenía una herida de tres cuartos de pulgada en la vagina, pero el himen estaba intacto y no había sido desflorada. Demostró, además, que Meléndez tenía heridas en la cara y espalda y que había dicho que esas heridas habían sido hechas con uñas. Otros testimonios comprobaron que (1) la víctima estaba físicamente bien en la mañana del día de los hechos; (2) los tres acusados habían estado esa noche cerca del lugar del suceso, tomando licor, y había habido encuentros personales entre Meléndez y Ramos y Meléndez y Soto; (3) esa noche, cerca del sitio

---

por separado cuando se acusa conjuntamente a varias personas y una de ellas ha hecho admisiones o confesiones que afectan a las otras, a menos que el fiscal anuncie que no ofrecerá tales admisiones o confesiones como prueba. Otros tribunales de apelación se han negado a aceptar esa regla, adoptando el principio de que el tribunal puede aclarar la situación satisfactoriamente mediante instrucciones apropiadas al jurado. Examínense sobre el problema: *Pueblo* v. *Casanova*, 77 D.P.R. 729, 735 (1954); *People* v. *Sweetin*, 156 N.E. 354 (Ill. 1927); *People* v. *Buckminster*, 113 N.E. 713 (Ill. 1916); *People* v. *Carmichael*, 145 N.E. 673 (Ill. 1924); *People* v. *Bolton*, 171 N.E. 152 (Ill. 1930); *People* v. *Patris*, 196 N.E. 806 (Ill. 1935); *Davis* v. *People*, 43 Pac. 122 (Col. 1895); *People* v. *Rupert*, 146 N.E. 456 (Ill. 1925); *People* v. *Sweeney*, 136 N.E. 687 (Ill. 1922); *People* v. *Lindsay*, 107 N.E.2d 614 (Ill. 1952); *People* v. *Feolo*, 26 N.E.2d 256 (N.Y. 1940); *Krulewitch* v. *United States*, 336 U.S. 440, 453 (1949); *Anderson* v. *United States*, 318 U.S. 250, 351 (1942); *Delli Paoli* v. *United States*, 352 U.S. 232, 247 (1957); *Nash* v. *United States*, 54 F.2d 1006, 1007 (C.C.A. 2, 1932); *United States* v. *Pugliese*, 153 F.2d 497, 501 (C.C.A. 2, 1945); *United States* v. *Haupt*, 136 F.2d 661 (C.C.A. 7, 1943); *United States* v. *Gottfried*, 165 F.2d 360, 367 (C.C.A. 2, 1948); *Schaffer* v. *United States*, 221 F.2d 17 (C.C.A. 5, 1955); *People* v. *Doran*, 159 N.E. 379 (N.Y. 1927); *People* v. *Fisher*, 164 N.E. 336 (N.Y., 1928); *People* v. *Snyder*, 159 N.E. 408 (1927); *People* v. *Santo*, 273 P.2d 249 (Cal. 1954) *cert. denegado*, 348 U.S. 959 (1955); *State* v. *Ríos*, 112 A.2d 247 (N.J. 1955); *Kirkendoll* v. *State*, 281 S.W.2d 243 (Tenn. 1955). Véanse, además, los comentarios sobre el caso de *Delli Paoli* en 43 Cornell L. Q. 128 (1957); 10 Vanderbilt L. Rev. 859 (1957); y 56 Col. L. Rev. 1112 (1956) y la Anotación *Right to severance where codefendant has incriminated himself* en 54 A.L.R.2d 830.

de los hechos, se habían escuchado gritos de mujer que decían "no me des más, no me den más"; (4) la víctima, al ser socorrida por la policía, había dicho que un grupo de hombres, blancos y negros, la habían golpeado y que "hay uno trigueño que tiene que estar arañado"; y (5) la camisa que Meléndez había usado la noche de los hechos contenía manchas de sangre humana. Se comprobó que en la madrugada del día siguiente, Meléndez le había llevado la camisa a una comadre suya para que la lavara, pero ella no lo hizo y más tarde la entregó a la detective.(³)

Luego de retirarse el jurado, el fiscal presentó como testigo al detective Francisco Vázquez, quien declaró sobre la manera que se habían obtenido las confesiones de Meléndez y Soto, pero no dijo nada en cuanto a la declaración de Ramos. La defensa produjo, entonces, al testigo José Luis López, de la redacción del periódico "El Día". Éste declaró sobre algunos hechos acaecidos en el cuartel de la policía cuando se interrogaba allí a los acusados. Luego el tribunal admitió en evidencia las declaraciones de los tres acusados, no obstante las repetidas objeciones de la defensa. Admitidas esas declaraciones, los tres renunciaron expresamente al jurado y el juicio continuó celebrándose por tribunal de derecho.

En estas condiciones la defensa presentó su prueba, la cual consistió principalmente del testimonio de cuatro personas que situaron a Ramos, antes de cometerse el delito, montado en un vehículo público que se alejaba del sitio de los hechos y camino de la ciudad de Ponce. Se admitieron, además, tres ejemplares del periódico "El Día" que contienen información sobre el suceso.

---

³ Se admitieron, junto a otras piezas de evidencia, unas fotografías en que aparecen los acusados, en el sitio de los hechos, custodiados por la policía. El fiscal intentó presentar en evidencia unos pantalones manchados de semen, alegando eran los que Meléndez había usado la noche del suceso, pero decidió retirarlos ante las objeciones de la defensa. (T.E. pág. 345–346.)

El tribunal declaró a los tres acusados culpables del delito de asesinato en segundo grado, manifestando al hacerlo que "este es un caso donde la única prueba que hay contra los acusados (y no quiero decir que sea una prueba pobre) es la declaración de Confesor Meléndez y de Francisco Soto." (T. E. pág. 388.) Francisco Soto no apeló de la sentencia que se le impuso. Hermenegildo Ramos apeló y revocamos la sentencia por no aparecer de los autos "prueba más allá de duda razonable para su convicción." [4]

■■ El expediente del caso demuestra que la confesión de Meléndez Santos se produjo en las siguientes circunstancias: El día 31 de mayo de 1955, como a las 8 A. M., se arrestó "para investigación" a Francisco Soto Delgado y se le condujo al cuartel de la policía. Soto admitió inmediatamente haber participado en el delito y por la información que suministró a la policía, se arrestó, también "para investigación", a Confesor Meléndez Santos y Hermenegildo Ramos. El arresto de Meléndez se realizó el mismo día 31 como a las 9 A.M., mientras él salía de un velorio. El detective Francisco Vázquez lo llevó al cuartel de la policía y al llegar, Meléndez se topó con Soto, quien delante de varios policías y otras personas le dijo que él (Soto) había declarado y era testigo de El Pueblo y aconsejó a Meléndez que hiciera lo mismo. Desde ese momento hasta el otro día por la mañana, Meléndez estuvo sujeto a un interrogatorio conducido por turnos[5] y en el cual participaron por lo menos cinco policías armados[6] y un fiscal.[7] En ningún mo-

---

[4] Sentencia de este Tribunal de 4 de junio de 1957.

[5] Declaró el detective Vázquez: "Cuando empezaba a hablar uno, estaba uno solo y el otro afuera.

"¿Usted venía y hablaba?

"Sí señor.

"¿Usted se iba y venía otro?

"Sí señor." (T. E. pág. 249.)

[6] Capitán Ernesto Lugo Méndez, Teniente Luis V. Costas, detectives Ramón Negrón, Francisco Vázquez y Rafael Rivera Rosario. Además, el cabo Radamés Pierantoni "asesoró" en la investigación y el interrogatorio.

[7] Fiscal Julio Fernández Cabrera.

mento se le advirtió de su derecho a no declarar ni de que sus declaraciones podrían ser utilizadas en su contra. Durante todo ese tiempo (alrededor de 22 horas) Meléndez estuvo custodiado en el cuartel sin que tuviera oportunidad de entrevistarse con parientes, amigos o abogados.[8]   Se le sirvió una "mixta" de almuerzo, luego una comida y un desayuno de café, pan y mantequilla al otro día.   Tomó agua, se lavó la boca y la cara y se bañó.   No hay prueba de que durmiera durante el tiempo que estuvo detenido.   El detective Vázquez declaró, refiriéndose a los acusados, que "si no durmieron, yo no lo sé.   Nosotros descansábamos y ellos también."   (T. E. pág. 258).   El "descanso" tenía lugar en un banco de madera.   Considerando la afirmación de Vázquez de que el interrogatorio duró hasta que Meléndez dijo que había tenido participación, y que continuó durante el día y la noche hasta el día primero por la mañana, (T. E. págs. 237–238), tenemos que concluir que Meléndez no durmió durante el tiempo en que estuvo en el cuartel.[9]

Vázquez declaró que el interrogatorio se condujo en voz normal y sin castigo físico, amenazas o promesas de bene-

---

[8] "¿Quiere decir que en todo momento Confesor, el acusado, estuvo con alguna persona de la detective o de la policía allí?

"Sí señor, custodiado.

"¿Qué clase de trabajo hacían con él?

"Investigarlo y preguntarle sobre el caso.

"¿Esas preguntas, con qué regularidad se les hacían?

"Se le preguntaba ahora y al rato se le hacía otra pregunta.

"¿Quiénes participaban en ese interrogatorio?

"Yo, el capitán, el teniente Costas, el detective Negrón, el detective Rivera.   Uno le preguntaba, y después le preguntaba otro.

"¿En esa serie de preguntas, que unas veces le hacía el capitán, y otras veces el teniente Costas, el detective Rivera y usted, quién más participó en ese interrogatorio?

"El detective Negrón.

"¿El fiscal Fernández Cabrera, también participó?

"También.

"¿Alguien más?

"Yo no recuerdo más ninguno."   (T. E. págs. 235–236.)

[9] Queda, además, parcialmente confirmado por el hecho apuntado más adelante, de que al irse Vázquez a descansar a la una y treinta de la madrugada, otras personas continuaron interrogando a Meléndez.

ficio. Durante todo el tiempo el acusado se mantuvo "con la cabeza baja" y en silencio, excepto cuando hablaba para negar su participación en el delito. "Siempre" contestaba: "El otro me quiere meter pero yo no cometí el delito." [10] (T. E. págs. 231, 240, 257.)

"¿A pesar de que seguía diciendo que no tenía nada que ver con eso, usted seguía diciéndole, le seguía diciendo 'eres tú' "?

"Sí señor. En esa misma forma hasta que lo convencí, que me dijo la verdad." (T. E. pág. 240.)

Vázquez añadió que continuamente le decía "¿Si éste te acusa, por qué vas a negar que no fuiste a ese sitio y cometiste ese delito? ¿Por qué no acabas y nos haces trabajar?" (T. E. pág. 240.)

"Ya estamos cansados de este caso." [11] (T. E. pág. 250.)

Las personas a cargo del interrogatorio, con la excepción del fiscal, tenían armas de fuego en su posesión. Vázquez admitió que en el pasado en varias ocasiones había agredido a diversas personas durante el curso de investigaciones oficiales— "para defenderme" —pero que nunca se le habían formulado cargos por tales hechos. En una ocasión lo denunciaron y salió absuelto.

Durante la noche del 31 de mayo, mientras se interrogaba a Meléndez, se reunieron muchas personas [12] frente al cuartel haciendo comentarios hostiles contra los detenidos. Algunas de esas personas penetraron al cuartel, otras per-

---

[10] "¿Hasta ese momento, hasta el día primero por la mañana, él no le había dicho a nadie nada?

"No. Solamente que el otro decía que él estaba también." (**T. E.** págs. 230–231.)

[11] El testigo José Luis López añadió lo siguiente: "Ellos, cuando los estaban interrogando, prometían hablar más tarde. La promesa era de ellos a la policía. 'Yo declaro más tarde, déjenme descansar un rato' ". (T. E. pág. 280.)

[12] El detective Vázquez dijo que se reunió "gente" comentando "¡Qué crimen!" pero que no hubo que llamarles la atención. (T. E. págs. 252–253.) El testigo José Luis López calculó que había de 50 a 75 personas, en ningún momento "más de cien", y que "se encontraban hablando en contra de ellos tres." (T. E. págs. 282–283.)

manecieron fuera. La policía no realizó esfuerzo alguno para cumplir con su claro deber de dispersar al gentío y de impedir que personas hostiles a Meléndez entraran hasta bien cerca del sitio donde se le interrogaba. Considerando el sitio en que se examinaba al detenido, el hecho de estar abiertas las puertas y ventanas del cuartel y el ruido que necesariamente producen alrededor de setenta y cinco personas al hablar entre sí, debemos forzosamente concluir que Meléndez tuvo conciencia de la concentrada agitación popular en su contra.

Declaró Vázquez que alrededor de la una y media de la madrugada, él se retiró a descansar, continuando el "resto de las personas" el interrogatorio de Meléndez (T. E. pág. 255) y que al otro día por la mañana, entre siete y media y ocho cuando regresó a su trabajo, el acusado, luego del desayuno, de lavarse la boca y la cara y de habérsele dicho que el "otro" había confesado, le dijo: "Bueno, voy a decir la verdad, como pasó el caso." (T.E. pág. 248.) Vázquez no relató lo que Meléndez le dijo. ([13]) No había nadie más presente en ese momento. A las nueve varios agentes lo llevaron al sitio de los hechos donde, junto a Soto y Ramos, pasó la mañana, siempre rodeado por la policía y los fotógrafos de ésta y sin que pudiera en ningún momento comunicarse con terceras personas. Vázquez declaró que allí Meléndez señaló el sitio de los hechos, pero de ninguna de las fotografías que se tomaron consta esa actuación, mientras que en varias de ellas el otro detenido, Soto, figura haciendo señales. Vázquez explicó que no se tomó fotografía alguna de Meléndez mientras éste señalaba y que, además, Meléndez permaneció en silencio mientras Soto señalaba el sitio. ([14])

---

[13] Vázquez en ningún momento explicó lo dicho por Meléndez en esta ocasión. Anteriormente había declarado: "Me dijo Confesor lo que había hecho el día primero por la mañana." (T. E. pág. 230.)

[14] T. E. págs. 304–315.

A las dos de la tarde de ese mismo día, Vázquez llevó a Meléndez, luego de éste almorzar, a la oficina del Fiscal Fernández Cabrera, donde estuvo prestando declaración hasta las cinco y media. Vázquez presenció la entrevista con el Fiscal y declaró que al detenido no se le pegó, se le amenazó o se le hizo clase alguna de promesa para que declarara y que su declaración fue voluntaria y estaba "tranquilo". Tres otras personas estaban presentes en esa ocasión,[15] pero ninguna de ellas prestó testimonio en el juicio. Luego Vázquez llevó a Meléndez otra vez al cuartel donde comió y se le tomaron las huellas digitales. Más tarde, lo condujo ante un juez. En la noche de ese mismo día—aproximadamente 36 horas después del arresto [16]—el detenido ingresó a la cárcel por orden judicial.

Luego de examinar la *totalidad de la conducta oficial* en este caso y *las circunstancias personales del acusado*, estamos convencidos de que la confesión de Meléndez Santos se obtuvo mediante coacción sicológica. En vista de que en los casos de *Pueblo* v. *Fournier*, 77 D.P.R. 222 (1954); 80 D.P.R. 390 (1958), hicimos un análisis exhaustivo de la materia, es innecesario recargar esta opinión con un examen de los principios y reglas aplicables. Basta recordemos que compete a este Tribunal, independientemente de la conclusión del juez sentenciador, determinar a la luz de los hechos admitidos o incontrovertidos y de las justas inferencias que emanen de ellos, si la confesión del acusado se obtuvo mediante coacción física o sicológica en violación de la cláusula constitucional del debido proceso de ley. Al dar cumplimiento a esa delicada responsabilidad debemos "pesar las circunstancias opresivas contra la facultad de resistencia de la persona que confesó." *Pueblo* v. *Fournier*, 80 D.P.R. 430. Proce-

---

[15] Dos empleados de la fiscalía y un individuo que había sido alguacil y que sirvió como testigo de la marca puesta por el acusado en la declaración. Vázquez no pudo precisar la hora exacta en que se tomó la declaración de Meléndez. (T. E. pág. 225.)

[16] Vázquez tampoco pudo precisar la hora exacta en que Meléndez ingresó a la cárcel. (T. E. pág. 259.)

demos, por consiguiente, a enumerar los elementos que integran la coacción en este caso y los precedentes en que se apoyan.

1) Detención ilegal por alrededor de treinta y dos horas y media desde el arresto hasta el momento de ponerle su marca el detenido a la confesión. *Pueblo* v. *Fournier,* 77 D.P.R. 261–265; 80 D.P.R. 449; *Payne* v. *Arkansas,* 356 U.S. 560, 563 (1958); *United States* v. *Jackson,* 256 F.2d 7, 12 (C.C.A. 2, 1958).

2) Durante ese mismo número de horas el acusado estuvo sin dormir.([17]) *Ashcraft* v. *Tennessee,* 322 U.S. 143, 153 (1943); *United States* v. *Jackson,* supra, pág. 12.

3) Interrogatorio a cargo de cinco policías armados [18] y un fiscal, utilizando el sistema de turnos (*relay*). *Ashcraft* v. *Tennessee,* supra, pág. 149; *Harris* v. *South Carolina,* 338 U.S. 68, 69 (1949); *Watts* v. *Indiana,* 338 U.S. 49, 52 (1949); *Turner* v. *Pennsylvania,* 338 U.S. 62, 63 (1949). *Cf. Stein* v. *New York,* 346 U.S. 156, 185 (1946).

4) Interrogatorio durante todo un día y una noche, el cual sólo se interrumpió cuando el detenido aceptó declarar. Aparte de algunos "descansos" en un banco de madera, Meléndez estuvo contestando preguntas durante alrededor de veintidós horas consecutivas. Luego se le trasladó bajo custodia policíaca al sitio de los hechos y más tarde prestó decla-

---

([17]) Cabe presumir, además, que antes de su arresto Meléndez Santos había estado varias horas sin dormir, pues se le arrestó al salir de un velorio. En *Pueblo* v. *Fournier,* 80 D.P.R. 430–459, especialmente 453, el testimonio oral y la prueba fotográfica demostraron terminantemente que la falta de sueño no afectó las facultades físicas y mentales del acusado. En el presente caso no existe tal prueba y, por consiguiente, tenemos que atenernos a las naturales consecuencias de fatiga y agotamiento que produce la prolongada falta de sueño. Véase el escolio 27, *infra.*

([18]) No puede considerarse involuntaria una confesión por el único hecho de que estuvieran armadas las personas que interrogaban al acusado o le mostraran armas a éste. Véanse *Hornsby* v. *State,* 10 So. 522 (Ala. 1892); *Stevens* v. *State,* 35 So. 122 (Ala. 1903); *Tait* v. *State,* 65 So.2d 208 (Ala. 1953) y el escolio 23, *infra.*

ración ante el fiscal y varios agentes policíacos y empleados de la fiscalía por alrededor de tres horas y media. *Ashcraft* v. *Tennessee*, supra, pág. 153; *United States* v. *Jackson*, supra, pág. 12; *State* v. *Crittenden*, 36 So.2d 645, 647 (1948); *State* v. *Roberson*, 103 So. 283, 386–387 (1925).

5) Desde el arresto hasta que signó la declaración (treinta y dos horas y media) el detenido estuvo completamente incomunicado de sus familiares, amigos y de personas ajenas a la policía, no tuvo asistencia legal y estuvo siempre bajo custodia policíaca. No se le advirtió de su derecho a no declarar hasta varias horas después de que se había quebrado su resistencia y le había hecho una admisión a Vázquez y, por consiguiente, cuando ya estaba sujeto a las desventajas sicológicas y prácticas de ese acto.([19]) *Malinski* v. *New York*, 324 U.S. 401, 405 (1945); *Turner* v. *Pennsylvania*, supra, pág. 64; *Payne* v. *Arkansas*, supra, pág. 567; *United States* v. *Jackson*, supra, pág. 16; *Cf. United States* v. *Bayer*, 331 U.S. 532, 540 (1946).

6) Presión producida por la presencia de un gentío hostil. Mientras se llevaba a cabo parte del interrogatorio, se aglomeró un buen número de personas frente al cuartel haciendo comentarios hostiles contra los detenidos. Algunas de esas personas penetraron al cuartel. *Cf. State* v. *Whiteman*, 67 N.W.2d 599 (N.D. 1954); *Payne* v. *Arkansas*, supra, 564; *Thomas* v. *Arizona*, 356 U.S. 390 (1958); *People* v. *Crabb*, 24 N.E.2d 46, 49 (1939).

7) Escasa capacidad sicológica del acusado para resistir las presiones a que estuvo sujeto—se trata de un cortador de cañas, analfabeto, pobre, sin conocimiento de sus dere-

---

([19]) "El marco más adecuado para obtener una confesión es el de mantener incomunicado al sospechoso. Un alto por ciento de las confesiones inducidas impropiamente tiene lugar mientras se mantiene 'congelado' al sospechoso en violación de las disposiciones legales sobre arresto y acusación." Wicker, *Some Developments in the Law Concerning Confessions*, 5 Vanderbilt L. Rev. 507, 511 (1952).

chos como acusado([20]) y con experiencias únicamente en su esfera social. *Ashcraft* v. *Tennessee*, supra, pág. 148; *Harris* v. *South Carolina*, supra, pág. 70; *Cf. Haley* v. *Ohio*, 332 U.S. 596 (1948); *Fikes* v. *Alabama*, 352 U.S. 191, 193 (1957); *Payne* v. *Arkansas*, supra, pág. 567; *State* v. *Peterson*, 75 A.2d 368, 371 (1950); *State* v. *Bernard*, 106 So. 656, 657 (1925); *State* v. *Robinson*, 41 So.2d 848, 851 (1949); *State* v. *Phelps*, 69 So. 856 (1915); *Crooker* v. *California*, 357 U.S. 433 (1958).

En suma, las circunstancias que hemos analizado demuestran palpablemente que a Meléndez Santos se le extrajo una confesión por medio de ininterrumpidas e implacables presiones sicológicas puestas en movimiento por los funcionarios investigadores. Esa coacción, integrada por todos los elementos que ya hemos reseñado,([21]) comenzó desde el momento mismo de la detención ilegal, se extendió con toda su crudeza por cerca de día y medio, y algunos de sus elementos persistieron aún después de que el detenido había confesado. No puede militar contra esta conclusión el testimonio de Vázquez de que él interrogó a Meléndez de manera tranquila y utilizando un tono normal de voz([22]) y que lo mismo hizo el fiscal más tarde, máxime cuando tales explicaciones deben tomarse con un "grano de sal", en vista del

---

([20]) La prueba demuestra que Meléndez Santos anteriormente había sido convicto de un delito de ataque para cometer homicidio y que estuvo en prisión "un año para dos." (T. E. pág. 396.) Esta condena aislada y la mayoría de edad del acusado son claramente insuficientes para sostener que tenemos ante nos a una persona conocedora de sus derechos, capacitada para defenderlos, y habituada a tener relaciones con la policía.

([21]) Aunque prueba independiente de la veracidad de una confesión obtenida mediante coacción no destruye su carácter involuntario ni la hace admisible—*Pueblo* v. *Fournier*, 77 D.P.R. 276; *Payne* v. *Arkansas*, supra, pág. 567—un análisis de las declaraciones de los tres acusados en este caso demuestra contradicciones importantes en cuanto a la manera en que ocurrieron los hechos, lo que adiciona un elemento más de duda sobre la voluntariedad de la declaración del apelante. Cf. *State* v. *Peterson*, supra; *United States* v. *Jackson*, supra.

([22]) En vista de que surge claramente de los testimonios de Vázquez y López que la confesión de Meléndez fue involuntaria, no nos hemos detenido a considerar el hecho de que la prueba de cargo no explicó lo suce-

desprecio mostrado por los investigadores hacia los derechos del acusado. *Cf. Haley* v. *Ohio*, supra, pág. 600.

No es posible encontrar en la extensa jurisprudencia sobre confesiones dos casos que sean idénticos. Hay siempre variaciones en la conducta oficial y en las circunstancias personales del detenido. No obstante, estimamos que *United States ex rel. Santo Caminito* v. *Murphy*, 222 F.2d 698 (C.C.A. 2, 1955), *cert. denegado*, 350 U.S. 896 (1955) tiene tan notable similaridad con el caso del aquí apelante que nos obliga a reseñarlo en detalle.

Se detuvo al acusado ("humilde, inconspicuo") durante una investigación de un delito de asesinato. Los hechos probados, según constan de la opinión del Juez Jerome Frank, fueron los siguientes:

"(1) La policía colocó a Caminito bajo custodia el domingo 11 de mayo de 1941, a las 6 P.M.

"(2) Comenzando a las 9 P.M. del domingo, se le interrogó continuamente por cinco o seis policías por un período de aproximadamente cinco horas, hasta las 3 A.M. del siguiente día, lunes 12.

"(3) A las 3 A.M. del lunes, 12 de mayo, se le encerró en una celda en la cual no había cama, mantas, colchón de alambre o 'mattress', sino únicamente un banco de madera. (Caminito testificó que la celda no tenía calefacción. Un testigo del Estado declaró que tenía un calentador pero que 'él no sabía si estaba funcionando' durante el tiempo en que Caminito estuvo confinado.)

"(4) A las 10 A.M. del lunes, 12 de mayo, se reanudó el

---

dido a Meléndez mientras era interrogado por varios agentes de la policía y el fiscal fuera de la presencia de Vázquez. En algunas jurisdicciones norteamericanas, cuando hay razones para sospechar que se ha extraído la confesión al acusado por medios ilegítimos, se impone al juez la obligación de no admitir evidencia de la confesión hasta tanto hayan declarado todas las personas que participaron en el interrogatorio. Véanse *People* v. *Rogers*, 136 N.E. 470, 475 (Ill. 1922); *State* v. *Green*, 60 So.2d 208, 214 (La. 1952); *People* v. *Cope*, 178 N.E. 95, 98 (Ill. 1931); *People* v. *Thomlison*, 81 N.E.2d 434, 437 (Ill. 1948); *People* v. *Mummiani*, 180 N.E. 94, 97, 98 (N.Y. 1932); *People* v. *Sloss*, 104 N.E.2d 807 (Ill. 1952). *Cf. Hopt* v. *Utah*, 110 U.S. 574, 585 (1884); *Redwine* v. *State*, 61 So.2d 715, 719 (Ala. 1952).

interrogatorio, el cual continuó durante el día, a cargo de varios detectives haciendo turnos.

"(5) Miembros de la familia de Caminito, sus amigos y un abogado escogido por la familia, acudieron al cuartel donde él estaba detenido y trataron de obtener información sobre su paradero. Los agentes de la policía conocían esos hechos, pero lo mantuvieron incomunicado. Aparte de la policía y el fiscal, nadie pudo verlo hasta el acto de lectura de la acusación, cuarenta horas después de haber sido puesto bajo custodia.

"(6) Durante la tarde del lunes 12 de mayo, se trajeron dos mujeres y un hombre para enfrentarlos a Caminito. No se le informó que eran detectives. Cada uno falsamente pretendió identificarlo como la persona que estaba guiando el automóvil durante el tiroteo que ocurrió en relación al atraco.

"(7) Alrededor de las 9 P.M. del lunes 12 de mayo, veintisiete horas después de haber sido puesto bajo custodia, firmó una confesión. Poco tiempo después dió otra confesión al fiscal." (Pág. 649.)

Añadió el Juez Frank: "Juntos o separados, ni la detención ilegal por muchas horas ni el engaño al confrontar a Caminito con policías disfrazados que mintieron al identificarlo, serían suficientes para viciar las confesiones por haber sido obtenidas inconstitucionalmente. Pero esos factores agravaron las siguientes prácticas inconstitucionales que —*aún en ausencia de esos factores*—hicieron las confesiones inadmisibles: (a) La policía lo interrogó casi continuamente por 27 horas, excepto por un intervalo breve en una celda tan malamente equipada que le era virtualmente imposible dormir en ella a un hombre ya atormentado por el interrogatorio; (b) Durante ese largo período, la policía, en realidad, lo secuestró. Lo mantuvieron incomunicado, rehusando que su abogado, su familia y sus amigos lo consultaran." (Pág. 701. Énfasis nuestro.)

. . . . . . . .

"Todos los norteamericanos decentes enfáticamente condenan prácticas satánicas, como las arriba descritas, cuando las emplean los regímenes totalitarios. Debemos estremecernos cuando la policía norteamericana las utiliza, porque

no se ajustan, en lo más mínimo, a los principios de justicia civilizados. No tiene importancia que en este caso tengamos que suponer que no hubo brutalidad física. La tortura sicológica puede ser mucho más cruel y mucho más sintomática de sadismo. Muchos hombres que podrían resistir una paliza sucumbirían ante la fatiga. Mantener a un hombre despierto más allá del agotamiento, mientras continuamente se le aporrea con preguntas, es degradarlo, es despojarlo de su dignidad humana, es privarlo de su voluntad de resistir, es convertirlo en una criatura despreciable dominada por un solo deseo—librarse del tormento a cualquier costo. Cualquier miembro de este o de cualquier otro tribunal, para escapar de esa angustia, admitiría casi cualquier crimen. Ciertamente, infligir esa clase de castigo sicológico es más reprensible que un ataque físico: no deja marcas discernibles en la víctima. Porque es posible ocultarlo, se ha convertido en los regímenes 'brutalitarios' en el arma favorita de la policía secreta, empeñada en obtener confesiones para castigar a los inocentes." (Pág. 701.)

Si se comparan las circunstancias del caso de *Caminito* con lo acontecido a Meléndez Santos se observará que, excepto la falsa identificación, están presentes en ambos casos los mismos elementos de coacción—detención ilegal, interrogatorio continuado y por turnos, incomunicación absoluta hasta que se obtiene la confesión,([23]) falta de muchas horas

---

([23]) En el caso de *Caminito* varias personas insistieron en ver al detenido y la policía se negó; en el presente caso ni Meléndez solicitó ver a persona alguna ni nadie solicitó verlo a él. La diferencia no es importante. Como dijo el Juez Lumbard en *United States* v. *Jackson*, supra, pág. 16: "Cuando funcionarios de la ley crean una situación en la cual aquellos bajo su custodia no tienen, durante 23 horas, medios de comunicarse con el mundo exterior, ni una manera de dar a conocer su infortunio a personas desinteresadas, el sentido común requiere que decidamos que el respeto a los derechos constitucionales de sus prisioneros era secundario al deseo de obtener manifestaciones incriminatorias de los así aislados." Igual razonamiento es aplicable a la omisión de advertir al detenido de su derecho a no declarar cuando las circunstancias demuestran que la persona no tiene conciencia clara de ese derecho, *Cf. Pueblo* v. *Fournier*, 80 D.P.R. 451, y aun a situaciones en que la advertencia sea un mero

de sueño y escasa capacidad sicológica del detenido para resistir.[24] Agravan la situación de Meléndez el hecho de que el número de horas que transcurrió entre el arresto ilegal y la confesión escrita fue mayor que en el caso de *Caminito;* que el interrogatorio de éste último se suspendió por siete horas (3 a 10 A.M. del lunes 12 de mayo) mientras que el de Meléndez continuó ininterrumpidamente hasta que hizo la admisión verbal; y que en el caso de *Caminito* no hubo presión popular de clase alguna mientras que existió ese elemento en la situación del aquí apelante.[25]

En *Pueblo* v. *Fournier*, 77 D.P.R. 293, 302; 80 D.P.R. 450, expresamos enérgicamente nuestro repudio de los métodos coercitivos enderezados a extraer confesiones de personas bajo custodia oficial.[26] Razones poderosas, que afectan la esencia misma de nuestro sistema de justicia, sostienen esa actitud. Entre ellas cuentan la gran probabilidad de que la confesión resulte falsa por ser producto únicamente del deseo del confesante de escapar de la tortura, [27]

---

ritual, *Haley* v. *Ohio*, supra, pág. 601. Desde luego, no estamos resolviendo que tales elementos por sí solos y, en todas las ocasiones sean suficientes para decretar que una confesión es involuntaria. Repetimos que en casos de coacción sicológica siempre es necesario examinar la *totalidad* de la conducta oficial y las *circunstancias personales* del detenido.

[24] Conviene aclarar que, contrario a Meléndez Santos, Caminito nunca había sido arrestado o condenado por la comisión de un delito. Por otro lado, es muy probable que Caminito no fuera analfabeto, pues firmó su confesión.

[25] Son tan evidentes las diferencias entre la situación de Meléndez Santos y la de la segunda confesión de Ramón Antonio Fournier, tanto en lo que atañe a la conducta oficial como en lo que se refiere a las circunstancias personales de los dos acusados, que nos parece innecesario reseñarlas. Compárese el resumen que hemos hecho en esta opinión con el que consta en *Pueblo* v. *Fournier*, 80 D.P.R. 422–459, particularmente las págs. 449–459.

[26] Dijimos también lo siguiente: "No resolvemos que un fiscal no pueda interrogar a un acusado, antes o después de su arresto, durante un período razonable. Indudablemente, el interrogatorio tanto de sospechosos como de testigos es de gran valor social en la detención y convicción de aquellos que son culpables de delitos serios." 77 D.P.R. 292.

[27] Es ésta necesariamente una cuestión de probabilidades (excepto, desde luego, en las ocasiones en que el resto de la evidencia comprueba la falsedad de la confesión) pues todavía no se han desarrollado métodos que con *absoluta certeza* demuestren que en un caso concreto la confesión fue producto de la coacción mental o física y que, además, es falsa.

la posible violación del privilegio constitucional contra la autoincriminación—*Pueblo* v. *Fournier*, 77 D.P.R. 257, escolio 6—y el choque entre esas prácticas impropias y aquellas nociones básicas de justicia que impiden a una comunidad civilizada hacer uso de la tortura mental o física para probar sus cargos contra un acusado. *Lisenba* v. *California*, 314 U.S. 219, 236 (1941) ; *Haley* v. *Ohio*, supra, págs 600, 605–607; *Malinski* v. *New York*, supra, págs. 416–17; *Payne* v. *Arkansas*, supra, págs. 567. Intimamente ligado a esta elemental noción de justicia está el efecto que tales prácticas necesariamente causan tanto sobre aquellos que las emplean como sobre los que resultan ser sus víctimas. Para los prime-

---

Véase el comentario del Juez Asociado Sr. Frankfurter en *Haley* v. *Ohio*, supra, pág. 606—"Desafortunadamente no poseemos pesos y medidas físicos o intelectuales por medio de los cuales el criterio judicial pueda determinar cuándo las presiones utilizadas para obtener una confesión alcanzan la intensidad coercitiva que exige se excluya una manifestación así lograda." Por tal motivo hay que depender de una "evaluación de los factores sicológicos, o más precisamente, del sentimiento general de la comunidad hacia esos factores sicológicos." (Pág. 605.) En un interesantísimo artículo titulado *Psycholinguistics and the Confession Dilemma*, 56 Columbia L. Rev. 19 (1956) Richard Arens y Arnold Meadow sugieren utilizar el análisis sicológico del lenguaje usado en la confesión para determinar el impacto de la presión policíaca sobre el declarante. "De la medición y análisis del impacto ejercido por la técnica policíaca sobre la confesión, el experto sicolingüista construye esa técnica ante el público como el paleontólogo que reconstruye un animal prehistórico." (Pág. 23.) Se ha sugerido, además, el uso de métodos científicos mediante los cuales pueda llevarse a los tribunales una imagen más precisa de la manera en que se toman las confesiones. Wigmore (3 *Evidence*, secs. 833, 851, 3ra. ed. 1940; Id., sec. 251a, Sup. 1957) recomienda equipar a la policía con aparatos de tomar películas sonoras, y la promulgación de una regla que declararía inadmisible en evidencia toda confesión que no se hubiera conservado en una de esas películas. En *People* v. *Hayes*, 71 P.2d 321 (Cal., 1937) se utilizó ese sistema y fue aprobado por el tribunal. Véase también, Wicker, *op. cit.* supra, pág. 520. El fiscal Frank Hogan de Nueva York ha lanzado la idea de usar grabadoras para tomar declaraciones a los detenidos—*El Mundo*, ed. de 30 de julio de 1958, pág. 23. Examínense, finalmente, John Kennedy, *Some Practical Suggestions for the Taking of Criminal Confessions*, 48 J. of Crim. L., C. & P. S. 660 (1958) donde se hacen valiosas sugestiones sobre cómo mejorar la técnica de tomar confesiones, protegiendo a la vez los derechos del detenido, y Milton W. Horowitz, *The Psychology of Confession*, 47 J. of Crim. L., C. & P. S. 197 (1956) donde se describen los factores sicológicos que impulsan a los culpables a confesar.

ros puede significar el camino fácil en la investigación criminal, la manera de ahorrarse el esfuerzo y la fatiga que acompañan al trabajo cuidadoso y exhaustivo. Ha de constituir necesariamente una influencia degradante y embrutecedora que imperceptiblemente llevará al funcionario al cinismo y al desprecio de las garantías de ley y de constitución. En los segundos, estimulará sus actitudes antisociales y destruirá su confianza en los organismos de vigilancia e investigación y eventualmente su fe en la justicia. Si esos desarrollos persisten y extienden su radio de acción, dadas las mutuas fecundaciones entre gobierno y sociedad, cobraría grave urgencia el peligro de que surja un estado policíaco.

Nada indica que exista ese peligro en la actualidad. En los últimos cuatro años únicamente han llegado a este Tribunal dos casos en que se hubiera comprobado el uso de métodos de coacción. En ambos las circunstancias horripilantes del delito y la sostenida presión popular causaron una breve desviación en la conducta de los funcionarios investigadores. Ciertamente, no tenemos noticias de que se haya generalizado en nuestro país el uso de los métodos de "third degree" de la manera que existía en los Estados Unidos en la década de los treinta y que todavía persiste en muchas localidades de esa nación. (28) No es ésta, sin embargo,

---

(28) El informe de la *National Commission on Law Observance and Enforcement* (1931) nombrada por el Presidente Hoover, señaló que "El 'third-degree'—la inflicción de dolor físico o mental para extraer confesiones—está generalizado a través del país." El informe del *President's Committee on Civil Rights* (1947) nombrado por el Presidente Truman, declaró lo siguiente: "Hemos informado que varios funcionarios públicos han dejado de cumplir con su deber más elemental—la protección de las personas contra la violencia de la muchedumbre. Tenemos también que revelar la existencia de otras formas generalizadas y variadas de mala conducta oficial. Estas incluyen ataques físicos violentos contra grupos minoritarios por funcionarios de la policía, el uso de métodos de 'third-degree' para extraer confesiones, y brutalidad hacia los prisioneros. Las violaciones de los derechos civiles de esta naturaleza no son desde luego universales y numerosas agencias de la ley han hecho mucho en los

razón para relajar las normas y la vigilancia. Puerto Rico atraviesa por un período de profundas transformaciones sociales y económicas. Procesos paralelos de industrialización, urbanización, crecimiento económico y emigración en masa están dejando huellas imborrables en su fisonomía de pueblo. A ellos deben añadirse las tensiones producidas por las últimas guerras y por la grave situación internacional. Aunque no constituyen la causa única del crimen, lo cierto es que históricamente esas transformaciones y tensiones han ido acompañadas de un auge en la criminalidad.([29]) Las

últimos años para erradicar esos males." Partes de estos informes y evidencia más reciente sobre el problema se encuentran en Emerson y Haber, *Political and Civil Rights in the United States* (1952) págs. 106–14. Aún en Inglaterra, que justificadamente se ufana de poseer uno de los sistemas de justicia más eficientes y civilizados del mundo, ha habido recientemente transgresiones de esta índole. En su edición de 2 de agosto de 1958, la prestigiosa e internacionalmente conocida revista *The Economist*, luego de reseñar dos casos en los que la policía obtuvo confesiones mediante coacción sicológica (habiéndose comprobado en uno de ellos que la confesión era falsa), expresó lo siguiente: "Debemos enfatizar que estos no son casos aislados. Repetidas veces los métodos de la policía han adquirido prominencia en los juicios criminales: largas horas de interrogatorio, a veces durante toda la noche, hasta que se debilita la resistencia mental; promesas de que el acusado saldrá mejor si confiesa; amenazas de lo que le pasará si no lo hace. Ha habido otros casos —la alteración en la fecha del pasaporte de Lord Montagu, por ejemplo— que nunca han sido explicados. Pero cuando se declara culpable a un acusado se desacreditan las quejas contra la policía hechas en su favor. Ahora, sin embargo, la queja surge de una persona que sin lugar a dudas es inocente, y esta confesión probablemente falsa tiene que arrojar sospechas sobre todas las confesiones extraídas por un proceso similar. La policía parece estar tan ansiosa de extraer una confesión como de lograr una convicción, tal vez para evitarse trabajo, y para ello recurre a una variedad de lo que en otros países los ingleses justificadamente detestan como un 'lavado de cerebro'. Existen ahora bases firmes para una investigación de los métodos de la policía; el Parlamento debe insistir en que haya una." (Pág. 360.)

([29]) Glueck, *Crime and Correction* (1952) págs. 1–23; Branham y Kutash, *Encyclopedia of Criminology* (1949) pág. 47; Cohen (Ed.) *Youth and Crime* (1957) págs. 124–45; *The Columbia Encyclopedia* (2da. ed. 1950) pág. 480; 4 *Encyclopedia of the Social Sciences* 563–69 (1948); Glueck y Glueck, *Unraveling Juvenile Delinquency* (1950) págs. 3–7. De acuerdo con un informe oficial del Negociado Federal de Investigaciones,

estadísticas de los últimos años revelan que ésa es también la tendencia en Puerto Rico.([30])   La presión del número de delitos, el refinamiento de los métodos delictivos, la falta de adiestramiento en la ciencia de la investigación, la profesionalización del crimen, y los apremios populares y periodísticos, en el futuro podrían fácilmente empujar a los investigadores oficiales a recurrir con mayor frecuencia a la coacción física o mental para extraer confesiones de los detenidos. Generalmente serían los humildes y desamparados, como en el presente caso, las víctimas de esas desviaciones institucionales o individuales.([31])   Para que pueda contribuir eficazmente a la salud constitucional y moral de nuestro sistema

en 1957 hubo en los Estados Unidos un estimado de 2,796,400 delitos graves, que representan un aumento de 233,250 sobre 1956 y de 23.9 por ciento sobre el promedio para los cinco años anteriores. *El Mundo*, 24 de abril de 1958, pág. 32.

([30]) *Delitos Ocurridos en Puerto Rico*
Años 1942–43 a 1956–57

| Años | Número de delitos* | % de aumento sobre 1942–43 |
|---|---|---|
| 1942–43 | 112, 003 | |
| 1943–44 | 107, 434 | — 4. 08 |
| 1944–45 | 119, 546 | + 6. 74 |
| 1945–46 | 131, 695 | + 17. 58 |
| 1946–47 | 139, 789 | + 24. 81 |
| 1947–48 | 143, 885 | + 28. 46 |
| 1948–49 | 148, 013 | + 32. 15 |
| 1949–50 | 160, 022 | + 42. 87 |
| 1950–51 | 144, 503 | + 29. 02 |
| 1951–52 | 148, 747 | + 32. 81 |
| 1952–53 | 136, 418 | + 21. 80 |
| 1953–54 | 125, 382 | + 11. 95 |
| 1954–55 | 124, 239 | + 10. 93 |
| 1955–56 | 123, 877 | + 10. 60 |
| 1956–57 | 153, 018 | + 36. 62 |

*Los números correspondientes a los años 1942–43 a 1946–47 fueron suministrados por las oficinas centrales de la Policía de Puerto Rico. Los correspondientes a los años 1947–48 a 1956–57 se obtuvieron del *Informe Anual*, 1956–1957 de la Policía, pág. 29.

([31]) "Los ataques repetidos y no reparados a las libertades constitucionales de los humildes, destruirán las libertades constitucionales de todos. El índice de la calidad moral de una civilización es la manera como se comporta con los débiles y desvalidos." Juez Jerome Frank en el caso de *Caminito*, supra, pág. 706.

de justicia corresponde a la rama judicial reafirmar su inalterable repugnancia hacia esos métodos impropios y su firme disposición de rechazar sus frutos.

*Se revoca la sentencia apelada y se devuelve el caso para un nuevo juicio.*

El Juez Asociado Sr. Pérez Pimentel disintió.