EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ MARTÍNEZ FIGUEROA, JOSÉ ÁNGEL MELÉNDEZ OLIVERA, JULIO MANUEL RIVERA LÓPEZ y PABLO MORALES TORRES, acusados y apelantes.

*Número:* 16907      *Resuelto:* 5 de noviembre de 1962

414

*Luis E. Gandía Argüelles* y *Enrique González*, abogados de los apelantes; *J. B. Fernández Badillo, Procurador General*, y *Juan A. Faría, Procurador General Auxiliar*, abogados de El Pueblo.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El Fiscal de Distrito presentó acusación contra los cinco apelantes por el delito de violación imputándoles que el día 14 de mayo de 1956 "ilegal, voluntaria, maliciosamente, actuando entre sí de común acuerdo, valiéndose de la fuerza, la violencia, la intimidación y en contra de su voluntad, yacieron y tuvieron contacto carnal (*sexual intercourse*) con R... R... R..., quien allí y entonces no era esposa de los acusados." Celebrado el juicio ante tribunal de derecho, el ministerio público ofreció prueba testifical y documental —consistente esta última en las declaraciones prestadas por los acusados en el curso de la investigación preliminar. La

defensa sometió el caso sin practicar prueba, excepto la presentada para tratar de establecer la involuntariedad de las declaraciones de los acusados. Se les declaró culpables, y apelaron de las sentencias que les fueron dictadas,[1] señalando la comisión de tres errores.

1—El primer apuntamiento impugna la admisión en evidencia de las declaraciones escritas de los acusados fundándose en que las mismas fueron prestadas involuntariamente y como consecuencia de una detención y arresto ilegal. Precisa hacer un breve resumen de la prueba que tuvo el tribunal a quo ante sí, pero previamente debemos referirnos a lo expresado en *Pueblo* v. *Fournier*, 77 D.P.R. 222, 292 (1954) : "No resolvemos que un fiscal no pueda interrogar a un acusado, antes o después de su arresto, *durante un período razonable*. Indudablemente, el interrogatorio tanto de sospechosos como de testigos, es de gran valor social en la detención y convicción de aquéllos que son culpables de delitos serios," (Énfasis suplido.) así como a *Pueblo* v. *Meléndez*, 80 D.P.R. 787, 800 (1958), en donde citamos con aprobación de la opinión emitida por el Juez Jerome Frank en *United States ex rel Caminito* v. *Murphy*, 222 F.2d 698, 701 (C.A. 2, 1955) al afecto de que "Juntos o separados, *ni la detención ilegal por muchas horas* ni el engaño al confrontar a Caminito con policías disfrazados . . . *serían suficientes para viciar las confesiones* por haber sido obtenidas inconstitucionalmente." (Énfasis suplido.)

La prueba que desfiló sobre este extremo estableció que la policía recibió confidencias en el sentido de que Pablo Morales Torres estaba relacionado con los hechos del caso. Según la declaración de éste, él se dirigía a su hogar a almorzar —alrededor de la una de la tarde— cuando se detuvo un "jeep" de la policía, tripulado por dos agentes uniformados,

---

[1] El tribunal suspendió las sentencias a todos los acusados, con excepción de José Angel Meléndez Olivera. Sección 2 de la Ley Núm. 103 de 29 de junio de 1955, según enmendada, 34 L.P.R.A. (Supl. 1961) sec. 1042.

quienes le pidieron los acompañara. Accedió, y fue llevado a un cuartel en donde fue interrogado por espacio de una hora, al cabo de la cual admitió su participación en los hechos e identificó a las otras cuatro personas que le acompañaban esa noche. Morales condujo a los agentes a los hogares de los otros apelantes. Tres de ellos fueron recogidos en sus casas o en los alrededores del caserío San José, mientras que José Angel Meléndez compareció por la noche al cuartel acompañado de su padre. Los apelantes no ofrecieron resistencia, pero según el testimonio del oficial que conducía la investigación, de habérseles resistido, hubiera utilizado la fuerza para llevarlos. Llegaron al cuartel cerca de las tres de la tarde, y fueron interrogados por el Sargento Nazario. No fueron maltratados ni amenazados. Los padres de algunos de los acusados estaban presentes en el cuartel, aunque no en el lugar donde se conducía el interrogatorio. Informaron sobre su participación en los hechos y se llamó entonces al fiscal, quien interrogó individualmente a cada uno de los apelantes, después de advertirles que podían abstenerse de declarar y de que todo cuanto dijeran podía utilizarse en su contra. Se les dio de comer. Luego de leer las declaraciones, las firmaron y las entregaron al fiscal. Alrededor de las diez de la noche el fiscal terminó la investigación, y salió a someter el caso a un magistrado.

El juez que presidía la vista determinó que los acusados "en la ocasión en que fueron investigados, no estaban ni bajo arresto ni bajo detención, no estaban privados de su libertad en el sentido que contempla la ley" y calificó de "voluntaria" la comparecencia de éstos al cuartel. Se admite que los agentes no tenían en su poder mandamiento de arresto u orden de citación cuando gestionaron la comparecencia de los apelantes al cuartel. ■

Considerados todos los hechos en conjunto, y aun admitiendo para los fines de la discusión que los apelantes fueron

detenidos ilegalmente([2]) por no estar provistos los agentes de mandamiento de arresto y orden de citación, todas las circunstancias indican que sus declaraciones fueron voluntarias y espontáneas, que no medió el grado de coacción física o psicológica que tiñe de ilegalidad, según resuelto en los casos de *Fournier* y *Meléndez,* supra, cuyos hechos son claramente distinguibles, y en el de *Pueblo* v. *Caraballo,* Núm. 16634, opinión *Per Curiam* de 28 de enero de 1960.

2—Para la discusión de los dos errores restantes —el declarar sin lugar la moción interesando la absolución perentoria de los acusados y el ser las sentencias dictadas contrarias a derecho y a los hechos del caso— requiere hacer un resumen del testimonio de la perjudicada.([3]) Esta declaración aparece resumida en el alegato del Procurador General en la siguiente forma:

"[H]ace dos años y medio que ella vive en concubinato con R . . . G . . . V . . . El día 14 de mayo de 1956 ella salió con su mencionado concubino desde el caserío Manuel A. Pérez en dirección a San Juan, pero tuvieron que regresar porque en el trayecto el carro se les dañó. Mientras regresaban y al coger la curva para entrar a dicho caserío el carro se paró. Su concubino se apeó para ver qué tenía el motor, habiéndole pedido antes a ella jabón y una llave. Cuando ya él había terminado y fue a bajar la tapa del bonete del automóvil saltaron los acusados y se le abalanzaron encima. Al ella oír que su concubino dijo ¡Ay! se asomó y los vio encima de él. Ella fue lista y se metió en el medio de ellos y le cogió el cuello al más alto. Al mismo tiempo que le dijo a éste que no golpearan a su esposo le preguntó si lo que ellos

---

([2]) Cfr. *McNabb* v. *United States,* 318 U.S. 332 (1943); *United States* v. *Mitchell,* 322 U.S. 65 (1944); *Upshaw* v. *United States,* 335 U.S. 410 (1948); *United States* v. *Carignan,* 342 U.S. 36 (1961); *Mallory* v. *United States,* 354 U.S. 449 (1957). Véase, Regla 5(c) de las de Procedimiento Criminal Federal.

([3]) El único otro testigo presentado por el ministerio público fue el doctor Arsenio Comas, quien examinó a la perjudicada diez días después de la ocurrencia de los hechos. Inexplicablemente, se renunció al testimonio del concubinario de la perjudicada, por ser prueba acumulativa, y se dependió exclusivamente de las confesiones prestadas por los acusados para corroborar a la víctima.

querían era dinero, pero contestaron que no querían dinero pues lo que querían era a ella. Los acusados siguieron amenazando a su concubino. Uno de ellos lo amenazaba con un cuchillo, el bajito con un palo, y otro con el puño. Ella entonces les gritó que no le hicieran nada, que les suplicaba que lo hicieran por ella, pero no cedieron a pesar de sus súplicas. Entonces, en vista de que ellos seguían la amenaza, ella les dijo: 'No le hagan nada a él, yo voy a ceder a ustedes.' Al oír esto uno de ellos dijo, 'Bueno, aguántenmelo.' Mientras los acusados lo aguantaban a él uno de ellos le dijo a ella: 'Y usted eche para acá' y la cogió a ella. A él lo sentaron en la parte delantera del carro y uno lo amenazaba con un cuchillo y otro con un palo. Mientras tanto otro de ellos vino de frente a ella y la llevó de espaldas a la parte de atrás y le dio un empujón y la tiró sobre el asiento trasero, bajándole los panties y teniendo relaciones carnales con ella. Mientras tanto los otros le preguntaban al que estaba con ella: '¿Terminaste?' y éste le decía al otro: 'Sí, terminé.' El que estaba con ella volaba enseguida al sitio donde estaba su concubino para asegurarlo mientras el otro venía donde ella al acto carnal. Todos tuvieron relaciones carnales con ella una sola vez. Después que terminaron soltaron a su concubino y a ella la dejaron libre. Entonces se pararon todos los acusados bien parados y les dijeron a ella y a su concubino: 'Ahora prendan el carro y lárguense si quieren.' Mientras todo lo anteriormente ocurría ella notó que a su concubino le dio como un ataque pues él padece del corazón. Por eso tuvo que esperar en lo que le pasaba. Cuando él quería defenderla ellos le decían a ella: 'Estése quieta si no quiere que le pase algo a su esposo.' En aquel momento los acusados no parecían seres humanos sino que parecían fieras. No había conocido antes a ninguno de ellos. Después de eso, cuando su concubino se sintió mejor fueron al cuartel de la policía de Río Piedras y allí vieron al Teniente Rivera. Entonces se montaron con el Teniente Rivera en la guagua de la policía y fueron a dar una ronda para ver si podían localizar a alguno de los acusados. Ella no les vio las caras durante los hechos pues ellos tenían pañuelos amarrados. Ellos admitieron esto ante la policía, después de haber sido llevados al cuartel. Allí admitieron también haber tenido relaciones sexuales con ella. No dejó que su concubino recibiera golpe alguno de ellos durante el incidente.

.

Mientras uno de ellos tenía relaciones carnales con ella su concubino les dijo a todos: 'Ay, bendito, ustedes son hombres, no abusen de mi mujer así' y ella le gritó a él: 'No hables, R . . . , mira que te matan.' (T.E. pp. 18–27.) En la repregunta . . . dijo que todo ello ocurrió entre 7:00 y 7:30 P. M. El cuchillo se lo presentaron a su concubino no a ella. Esa noche sufrió mucho porque ella no quería que le pasara nada a R . . . y dijo, además, que quién sabría si ella podría correr peligro también porque ellos estaban que no parecían seres humanos, sino que parecían fieras. Ella no había tomado cerveza. Era a ellos que ella les gritaba y lloraba. No gritó pidiendo auxilio debido a las amenazas. No vino nadie porque por allí no había nadie. Como el miedo la 'cubrió' tanto a ella no se atrevió ni abrir la boca tampoco. Los acusados se lanzaron encima de su esposo con actividad, con mala manera, como para quitarle la mujer. Lo aguantaron como hombre que era, para dominarlo. El más alto le dijo a él: 'Estése quieto,' y alzó el palo para arriba con la mano derecha mientras lo aguantaba con la izquierda. No le dio porque ella actuó ligera. El que tenía el cuchillo también le dijo a su concubino que se estuviera quieto. Los acusados se quitaron los pañuelos del rostro después que terminaron la fechoría y enseguida les dijeron a ella y a su concubino que se largaran. Entonces ellos se fueron corriendo. El que tenía el cuchillo no tocó a su concubino, pero se lo apuntaba al pecho y le decía: 'Estése quieto'. Todos le decían a él que se estuviese quieto. Ella se agarró del que tenía el cuchillo y del que tenía el palo para que no le hicieran nada a su esposo. R . . . (el concubino) no gritó porque se puso malo enseguida. A R . . . no lo cortaron, ni aporrearon, ni le dieron con el palo, y no le dieron ni un rasguño porque ella no dejó que lo hicieran, a pesar de que para ello arriesgó su vida. Lo único que uno de ellos le hizo a ella fue apretarle la garganta para que ella le diera un beso a la brava. Mientras uno de ellos tenía relaciones sexuales con ella, otro la cogió por el cuello y le dijo: 'Si usted quiere que su esposo salga bien estése quietecita.' No había nadie armado frente a la puerta del carro donde ella estaba sentada que le impidiera salir cuando ellos llegaron. Ella salió por esa puerta, pero ella creía que los acusados le iban a hacer algo a su concubino y esperaba lo más grande debido a la manera en que ellos

estaban actuando allí. A ella se le cayó el cielo a la tierra. No la cortaron, ni le dieron bofetadas, ni con el palo. Ella estaba llorando y gritando porque en realidad ellos no interesaban dinero sino que lo que interesaban era a ella, y porque no le hicieran nada a su concubino ella cedió a lo que ellos dijeron. Ella no se entregó voluntariamente. Lo hizo por su esposo porque sintió miedo al verse al lado de esas fieras. Dijo entonces 'Hasta usted lo haría para salvar cualquier familiar suyo.' Ella no se iba a quedar dormida esperando que a él lo golpearan. Ella se cansó de suplicar y llorar y como ellos no quisieron oírle tuvo que rendirse. No le dio al que ella se le abalanzó al cuello porque creía que por compasión no harían lo que hicieron. Ella no se acostó en el asiento del carro. Ellos fueron los que la acostaron. Ella creía que cediendo no correría más peligro. El que la acostó a ella no tenía nada en las manos. La cogió por los molleros y la empujó de mala manera y ella cayó acostada en el carro y entonces se le tiró encima. Ella trató de morderlo pero recuerda que alguien la agarró por el cuello para que le diera un beso. Ella no estaba teniendo relaciones sexuales con su concubino cuando los acusados llegaron porque él estaba arreglando el carro y no podía hacer las dos cosas a la vez. Ella había pasado la regla hacía tres días pero por precaución estaba preparada. Mientras uno tenía relaciones sexuales con ella, otro de ellos le preguntaba al primero: '¿Terminaste?', y el otro le contestaba 'no, todavía', y entonces el otro le pedía que le avisara. Cuando uno terminaba le decía al otro 'Vente que yo terminé', y entonces, tan pronto el otro llegaba el que había terminado brincaba al sitio donde estaba el concubino de ella. Mientras eso ocurría ella no gritaba porque ella tenía miedo y creía que cediendo no le harían daño a su concubino. Ellos entraron a R . . . a la brava en el asiento delantero del carro. El del cuchillo era el que estaba más cerca de él aunque no estaba sentado en el carro. Ellos estaban solos con él apuntándole para que no se meneara y estaban agrupados. Los que estaban al lado del carro no dejaban que él abriera la puerta. Él decía a todos que no abusaran pues estaba mirando lo que ellos le hacían a ella, que la tenían acostada. Pero ella miraba que no le hicieran daño a él, pues cuando personas así se deciden a una fechoría van decididos a hacer cualquier cosa. Ella no corrió a los edificios vecinos porque ellos se agruparon alrededor de su concubino tan ligero que

ella pensó que si corría lo golpeaban a él. Ella lloró pero el miedo la hizo entregarse porque creyó que así le salvaba la vida y a él si no gritaba. A preguntas del fiscal en el redirecto (T.E. p. 104) dijo que con R . . . había tenido una nena y que ellos vivían y dormían en casa de un hermano de ella en el caserío Manuel A. Pérez."

En el apuntamiento de errores sostienen los apelantes que la acusación presentada imputa la modalidad del delito de violación prevista en el inciso 4 del Art. 255 del Código Penal, ed. 1937, 33 L.P.R.A. sec. 916, que consiste en yacer con mujer que no fuere la propia cuando la víctima opone resistencia pero ésta es vencida por fuerza o violencia; que la intimidación no es elemento integrante de esta modalidad ni de ninguna de las otras a que se refiere el artículo mencionado; y que aun cuando se entendiera que la acusación imputa la modalidad a que se refiere el inciso 3 —cuando la mujer estuviera impedida de oponer resistencia a causa de amenaza de grave e inmediato daño corporal, acompañadas de la aparente aptitud para ejecutarla—la prueba en tal caso sería insuficiente, pues solamente se demostró que la víctima se entregó para evitar que le hicieran daño a su concubinario, sin que en momento alguno le pegaran, la forzaran o la amenazaran a ella personalmente.

Antes de proceder a disponer de este señalamiento deseamos aclarar una manifestación que aparece en el alegato del Procurador General que, en síntesis, expone que como el Art. 255 del Código Penal se refiere a un solo delito, el hecho de que la acusación se formule bajo una modalidad equivocada es inmaterial. Invoca *People* v. *Tollack*, 233 P.2d 121 (Cal. 1951); *People* v. *Blankenship*, 228 P.2d 835 (Cal. 1951); *People* v. *Cassandras*, 188 P.2d 546 (Cal. 1948), en donde se dijo a la página 549 que "Está firmemente establecido que, irrespectivamente de la modalidad imputada en la acusación, si la prueba coloca el caso bajo cualquiera de las modalidades de la sección 261, el delito de violación queda satisfactoriamente establecido por el ministerio público";

*People* v. *Vann*, 61 Pac. 776 (Cal. 1900) y *People* v. *Snyder*, 17 Pac. 208 (Cal. 1888). En efecto tal era la doctrina prevaleciente en dicho estado, de donde procede nuestro Código Penal, y así se explicaba al exponerla en la glosa correspondiente a incongruencia entre la acusación y la prueba en 42 Cal. Jur.2d; *Rape*, sec. 46: "Cualquier incongruencia entre la información imputando al acusado la comisión de violación en una de las formas específicas relacionadas en el Código Penal al definir dicho delito y la prueba que establezca se cometió en cualquiera otra de las formas allí establecidas, es inmaterial. En otras palabras, no importa la modalidad del Código Penal a que aluda la acusación, si la evidencia establece su comisión en cualquiera de las modalidades, el delito ha sido cometido." Sin embargo, esta doctrina fue sustancialmente modificada en *People* v. *Collins*, 351 P.2d 326 (Cal. 1960), al expresarse que no se permitiría prueba sobre una modalidad distinta a la imputada a menos que el acusado, con anterioridad al acto del juicio —evidentemente refiriéndose a la vista preliminar— fuere advertido de la posibilidad de tal variación, evitándose así cualquier elemento de sorpresa. Expresamente se revocan los casos citados por el Procurador General, así como los de *People* v. *Mummert*, 135 P.2d 665 (Cal. 1943) y *People* v. *Jailles*, 79 Pac. 965 (Cal. 1905).

Sin embargo, este hecho en nada afecta para la resolución del presente caso pues, como indica el Procurador General, desde el año 1907 al resolver *Pueblo* v. *Rodríguez*, 12 D.P.R. 181, dijimos, apoyándonos en *People* v. *Pacheco*, 70 Cal. 473, 11 Pac. 761 (1886), que una acusación de violación que expresa que el acto fue cometido usando fuerza y violencia, y contra la voluntad y consentimiento de la mujer, equivale sustancialmente a expresar que la víctima opuso resistencia pero dicha resistencia fue vencida por la violencia, *o que dicha perjudicada estaba impedida de hacer resistencia con motivo de las amenazas de grave e inminente daño corporal acompañadas de la aparente aptitud para realizarlo.* El caso de

*Pacheco* no ha sido alterado ni modificado, y la doctrina establecida en el mismo prevalece en California, y ha sido citada con aprobación en *Harmon* v. *Territory*, 49 Pac. 55 (Okl. 1897) y *State* v. *Delvecchio*, 69 Pac. 58 (Utah, 1902). Examinada la acusación presentada en el presente caso, y aplicando lo resuelto en *Pueblo* v. *Rodríguez*, supra, resulta claro que a los acusados se les imputó la comisión del delito de violación, bajo cualesquiera de las modalidades a que se refieren los incisos 3 y 4 del Art. 255 del Código Penal. Cfr. *Pueblo* v. *Colón*, 81 D.P.R. 814, 819, *in fine* (1960).

Del resumen de la declaración de la perjudicada resulta que la prueba no justifica la conclusión de que la perjudicada opusiera resistencia física, pero ésta fue vencida por la fuerza o la violencia.(⁴)    Mas, ¿es suficiente para enmarcarla dentro de la modalidad que consiste en la incapacidad de la víctima de oponer resistencia a causa de amenazas de grave e inmediato daño corporal, acompañadas de la aparente actitud para ejecutarlas?    A este respecto debemos recordar que la prueba establece que los acusados amenazaron al concubinario de la perjudicada —los asaltantes le sujetaban y mantenían en inactividad, esgrimiendo uno de ellos un palo y otro en actitud de herirle con una cuchilla, mientras cada uno de ellos, en forma sucesiva satisfacía sus lujuriosos deseos— y que la ofendida, con el único propósito de evitar daño a su "esposo", se entregó, después que se "cans[ó] de suplicar y llorar."    Añadió que "no me entregué voluntariamente, lo hice por mi esposo porque yo sentí miedo al verme al lado de esas fieras, hasta usted lo haría por salvar cualquier familiar suyo."    (T.E., pág. 84.)  ▮

En *Pueblo* v. *Vega*, 20 D.P.R. 298 (1914), expresamos que el delito de violación esencialmente consiste en el ultraje

---

(⁴) La perjudicada declaró que el primero de los acusados en tener contacto con ella la "empujó de mala manera" hacia el asiento trasero del automóvil y que otro de ellos la apretó por la garganta "para que a la brava le diera un beso."    No obstante, surge claramente que ella se entregó debido al temor de que se le infligiera daño a su acompañante.

inferido a la persona y sentimientos de la mujer y envuelve siempre la falta de consentimiento de ésta. *Pueblo* v. *Oquendo*, 83 D.P.R. 234 (1961); *Pueblo* v. *Colón*, 81 D.P.R. 814 (1960). No tenemos duda alguna de que en el presente caso la perjudicada no consintió voluntariamente a la realización del acto carnal debido a que su entrega a los acusados obedeció al temor y miedo que éstos le infundieron. La ausencia de resistencia se explica por las amenazas proferidas por los asaltantes contra su concubinario y la aparente aptitud para ejecutarlas. El cuadro de los hechos en conjunto demuestra, sin lugar a dudas, que la perjudicada se sintió personalmente amenazada en su seguridad personal, por la actitud de los acusados, que le infundió miedo y temor. "Parecían unas fieras", es la frase que gráficamente caracteriza la conducta de los apelantes.

Si bien en el estatuto no se usa específicamente la palabra intimidación, y por tanto, el hecho de haberse incluido en la acusación debe entenderse superfluo, este concepto debe entenderse comprendido dentro del de amenaza a que alude el inciso 3, pues, como se indica en Perkins, *Criminal Law* (The Foundation Press, 1957), pág. 122, "las diferencias son (se refiere a los conceptos fuerza, miedo, temor e intimidación), sin embargo, más bien de forma que de sustancia." Y en cuanto a que el temor o miedo puede ser el causado por amenazas a una persona que tiene ciertas relaciones personales con la víctima, y que el mismo se entiende que es inducido a la propia víctima, véanse, *People* v. *Macchiaroli*, 202 Pac. 474 (Cal. 1921); *People* v. *Winters*, 329 P.2d 743 (1958); *Hazel* v. *State*, 157 A.2d 922 (Md. 1960).([5]) La

---

([5])Puig Peña, en su obra *Derecho Penal* (5a. ed. 1960), tomo IV, pág. 33, al referirse al delito de violación según el Código Penal Español, comenta que "Respecto a la intimidación, la doctrina es unánime en admitirla no sólo cuando se trata de la intimidación material (amenaza con pistola) sino también la intimidación propiamente moral (amenaza de un mal grave, (cita)) o presión psicológica intensa..., y no sólo cuando se ejercita sobre la persona que se quiere conseguir, sino que, a diferencia de la fuerza física, puede emplearse también contra un tercero..."

referencia en el alegato de los apelantes a *Darrell* v. *Commonwealth*, 88 S.W. 1060 (Ky. 1905) es claramente inaplicable pues se refiere a amenazas proferidas contra el padre de la víctima *después* de haberse realizado el acto carnal. Burdick, *Law of Crime*, vol. 2, sec. 483, tampoco sostiene la posición de los apelantes, pues si bien se expone que "Para que las amenazas constituyan implícitamente fuerza es preciso que se trate de grave daño corporal a la mujer misma," esta cita no puede leerse fuera del texto siguiente al efecto de que "Una amenaza de hacerla desmontar de un automóvil y caminar hasta su hogar o de arrestarla (hecha por una persona que se hacía pasar por un policía) no es suficiente para que constituya violación por amenazas, así como tampoco amenazas hechas después de consumado el acto para evitar que se revele el mismo tampoco constituyen la fuerza o violación."

*No habiéndose cometido los errores señalados, se confirmarán las sentencias dictadas por el Tribunal Superior, Sala de Bayamón, en 4 de septiembre de 1958.*