EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ROBERTO DE JESÚS CABRERA, c/p EL ITALIANO y JULIO ALFREDO ANTAS SANABRIA, c/p TARZÁN, acusados y apelantes.

*Números:* CR-65-415  *Resueltos:* 5 de mayo de 1967
CR-65-416
CR-65-417

*Víctor Tirado Saltares,* abogado de los apelantes; *J. B. Fernández Badillo, Procurador General,* e *Ida Cardona Ortiz, Procuradora General Auxiliar,* abogados de El Pueblo.

El Juez Asociado Señor Blanco Lugo emitió la opinión del Tribunal.

Uno de los crímenes más sórdidos y abominables que pueden concebirse ha dado margen al presente recurso de apelación. Roberto de Jesús Cabrera, conocido por El Italiano, y Julio Alfredo Antas Sanabria, conocido por Tarzán, fueron convictos de dos asesinatos en primer grado por haber causado la muerte a Charles Fisher, estrangulándole, y a Miguel A. Sánchez, asfixiándole por inmersión, de dos delitos de hurto mayor y de portación de armas. Los apuntamientos que se plantean para solicitar la revocación de las sentencias giran en torno a la admisión en evidencia de las confesiones prestadas por los acusados, lo que nos releva de narrar las circunstancias morbosas que rodean la comisión de los hechos.

El proceso se celebró durante los días 16 a 19 de febrero de 1965, y, aunque el juicio comenzó a ventilarse ante un jurado, en el curso del mismo, los acusados personalmente solicitaron que se continuara ante el juez que lo presidía. (¹) La prueba se refiere a dos confesiones, una oral y otra escrita, prestadas ambas ante el entonces fiscal Felipe Ortiz Ortiz. En cuanto a las de Roberto de Jesús Cabrera, el planteamiento sobre inadmisibilidad se funda en que: (a) son

---

(¹) A los fines del presente recurso solamente se ha elevado una transcripción parcial de las notas taquigráficas, limitada a la evidencia ofrecida a los testimonios sobre la forma en que se obtuvieron las confesiones. Sin embargo, de la minuta de la sesión del día 18 de febrero de 1965 (T.A. pág. 103) aparece que: "En esta etapa del proceso ambos acusados por sus abogados y personalmente renuncian a que los casos continúen por jurado y se someten al Tribunal de Derecho. Examinados extensamente sobre esta renuncia al jurado, ambos acusados la ratifican y el Tribunal la admite por entenderla libre, voluntaria e inteligente y dispone que los casos continúen por Tribunal de Derecho". *Pueblo* v. *Cabán Rosa,* 92 D.P.R. 866 (1965).

el producto de la coacción sicológica ejercitada para obligarle a prestarlas; (b) se le obligó a escenificar el crimen y a confesar luego que había manifestado su intención de no incriminarse; (c) escenificó y confesó sin estar asistido de abogado y sin que se le hubiera ofrecido un abogado pagado por el Estado; y, (d) se le detuvo por un tiempo irrazonable antes de conducírsele ante un magistrado. Respecto a las de Julio Antas Sanabria, alégase que (a) fue hecha sin estar asistido por abogado ni ofrecérsele uno pagado por el Estado; y, (b) no se tomó en consideración el hecho de su minoridad a los fines de la determinación sobre el carácter voluntario de las mismas.

1. El día 7 de noviembre de 1964 el fiscal Ortiz Ortiz interrogó a los apelantes quienes se encontraban detenidos en el Cuartel General de la Policía. Antes de comenzar a preguntarle sobre los hechos les hizo las advertencias que surgen de la siguiente parte de su declaración:

"R. Al primero que comencé a interrogar fue al señor Julio Antas Sanabria, conocido por Tarzán. Me identifiqué quién yo era. 'Yo soy el fiscal Ortiz Ortiz.' Le manifesté que él como supuesto acusado, tenía derecho a abstenerse de declararme a mí, porque la Constitución le garantizaba ese derecho y que si él me quería declarar, lo tenía que hacer voluntariamente, sin que yo le ofreciera nada. Que él tenía derecho a consultar con un abogado y que ponía a su disposición el teléfono de aquella oficina o cualquiera de los más próximos para que él se comunicara con algún familiar de él.

P. Qué más?

R. Eso fue todo lo que le dije.

P. Y qué le contestó a usted, señor fiscal, Tarzán, cuando usted le hizo esas advertencias?

R. Que para declarar no necesitaba abogado. Que se sentía culpable. Más o menos en esas palabras. Que quería declarar y que no tenía interés en llamar a ningún familiar. Que él para declarar en ese momento no necesitaba abogado, que él se sentía culpable y estaba arrepentido y no tenía interés en llamar a ningún familiar.

P. Y usted lo interrogó allí?

R. Sí señor.

P. Y él le contestó su interrogatoria?

R. Sí señor, él contestó.

.      .      .      .      .      .      .      .

P. Qué le dijo usted al Italiano cuando llegó el Italiano a su oficina de entonces, donde investigaba usted?

R. Le advertí que él, como supuesto acusado en el caso, tenía derecho a abstenerse de declarar, porque la Constitución así lo garantizaba. Que no le podía hacer ninguna promesa de ayudarlo. Que él tenía derecho a consultar con un abogado. Que le ponía a disposición los teléfonos de esa oficina para que se comunicara con algún familiar, a lo que contestó que ya se había comunicado con un familiar en Arecibo y también había entrevistado un policía que es familia de él o está casado con una prima de él y que vivía en Bayamón y que él no necesitaba abogado.

P. Y usted lo interrogó a él, le hizo preguntas?

R. Lo interrogué en ese momento.

P. Y él le contestó esas preguntas?

R. Sí señor."

De las confesiones escritas aparece que a ambos se les hicieron advertencias similares, más o menos en los siguientes términos:

". . . estoy investigando un caso en que resultaron muertos los señores Charles Fisher y Miguel A. Sánchez. De acuerdo con la prueba en nuestro poder usted puede resultar acusado por estos hechos. La Constitución del Estado Libre Asociado de Puerto Rico le garantiza a usted el derecho a abstenerse a declarar si usted así lo desea. Si usted declara tiene que ser voluntariamente, libremente sin que nadie le haya coaccionado ni lo haya amenazado o le haya hecho oferta de clase alguna. Usted tiene derecho a estar representado por un abogado si así usted lo desea para que le advierta de sus derechos y le brinde la asistencia legal que usted desee. Si usted interesa puede hacer uso del teléfono para llamar algún familiar. Luego de hechas estas advertencias, ¿desea usted declarar?"

Ambos respondieron en la afirmativa, explicando de Jesús Cabrera que "me gustaría tener la conciencia limpia y no tener ese motivo desesperado en mi alma", y Antas que "yo me siento culpable y arrepentido de lo que he hecho y deseo pagar por el error que he cometido y hago esta declaración por mi propia voluntad sin que nadie me haya obligado, pegado ni amenazado"; y, ante la afirmación de que lo que declarara podría utilizarse en su contra, añadió "Yo comprendo que eso me puede mandar a mí para 'home', pero a pesar de todo eso quiero declarar para pàgar mi falta."

██ Conforme a la doctrina expuesta en *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765 (1965), y *Pueblo* v. *Adorno Lorenzana*, 93 D.P.R. 788 (1966), para el mes de febrero de 1965, fecha en que se celebró el juicio de la causa que culminó en las sentencias condenatorias, solamente estaban disponibles para los acusados las normas anunciadas por el Tribunal Supremo federal en *Escobedo* v. *Illinois*, 378 U.S. 478, que había sido decidido el día 22 de junio de 1964. Interpretando el significado y alcance de esta opinión federal, dijimos en *Rivera Escuté* que:

". . . no son admisibles en evidencia en el 'proceso criminal' la confesión de un acusado o sospechoso o las admisiones que le perjudiquen sustancialmente, obtenidas de él bajo custodia de la policía u otra autoridad competente mientras se le interroga con el fin de obtener manifestaciones incriminatorias: (1) cuando no fue advertido de manera eficaz por la policía u otra autoridad competente antes de declarar, de su derecho constitucional absoluto a permanecer en silencio y a no incriminarse; (2) cuando no fue advertido por la policía u otra autoridad competente antes de declarar, de su derecho a tener ayuda de abogado, sin que el hecho de no haber sido solicitada afirmativamente por el acusado releve de la obligación de advertirle su derecho a tenerla; o (3) cuando solicitó consultar con abogado y no se le permitió el estar así asistido al obtenerse su declaración."

■ Como podrá observarse todas las advertencias exigidas entonces le fueron hechas a los apelantes antes de confesar. Se insiste, sin embargo, en que era preciso además informarle de su derecho a que el Estado le proporcionara asistencia legal cuando, como obviamente resulta en el presente caso, los presuntos acusados no dispusieran de medios para contratarlos. En *Pueblo* v. *Guadalupe Rosa,* 94 D.P.R. 190 (1967), explicamos que esta advertencia adicional que se adoptó por el Tribunal Supremo federal en *Miranda* v. *Arizona,* 384 U.S. 436 (res. en 13 de junio de 1966), no había sido incorporada en esta jurisdicción en virtud de la opinión de *Rivera Escuté,* supra; aclarándose así cualquier interpretación que en ese sentido pudiera hacerse en virtud de cierto lenguaje que utilizamos en *Adorno Lorenzana,* supra. Todo cuanto anticipamos en *Rivera Escuté* que no aparecía claramente en su progenitor *Escobedo* fue que, siguiendo a *People* v. *Dorado,* 398 P.2d 361, resuelto diez meses antes, no era necesario que el sospechoso solicitara afirmativamente la asistencia de abogado antes de interrogársele. Resumiendo, afirmamos que "Si en verdad no adoptamos esta norma en *Rivera Escuté* la omisión de tal advertencia sólo puede estar asequible a los acusados cuyos juicios se celebren con posterioridad a la decisión del caso de *Miranda*", o sea, después del 13 de junio de 1966.

*Carnley* v. *Cochran,* 369 U.S. 506 (1962), que se invoca por la parte apelante es distinguible, pues tratábase allí de la asistencia de abogado en el curso del juicio y la necesidad de advertir claramente al acusado que conducía su propia defensa de las consecuencias que tenía el ocupar la silla testifical.

2. A los fines de disponer de las otras impugnaciones sobre la admisión de las confesiones, es preciso hacer un breve resumen de la prueba que desfiló en relación con las

circunstancias que rodearon la toma de las declaraciones a los apelantes.

De Jesús Cabrera había sido detenido alrededor de las 3:00 A.M. del día 7 de noviembre en relación con una investigación que se practicaba por un delito de atentado a la vida ocurrido en Punta Salinas. Negó su participación en tales hechos y señaló como autor de los mismos a Antas Sanabria, solicitando que se le diera protección, por lo cual se le recluyó en la celda que para los detenidos en custodia tiene el cuartel general. Ese mismo día, cerca de las 10:00 A.M., Antas fue arrestado en relación con el hurto del automóvil del occiso Fisher, y con relación a los asesinatos perpetrados. El fiscal Ortiz Ortiz, quien se encontraba de turno, fue llamado al cuartel para la investigación del hurto del automóvil, y por ser el vehículo propiedad de una de las víctimas, para determinar qué relación podían tener los detenidos con el hecho de sangre. Al llegar al cuartel fue recibido por el guardia de retén y uno de los detectives adscrito a la Sección de Homicidios. Se le facilitó la oficina del comandante, dotada de aire acondicionado, para conducir el interrogatorio. Los detenidos se veían "normales", "muy joviales, muy simpáticos, sonrientes y comunicativos", y no expresaron queja alguna del trato recibido hasta entonces, admitiendo que se les habían proporcionado alimentos. Antas Sanabria fue el primero en ser interrogado. Ni el fiscal ni el taquígrafo, únicas personas presentes, portaban o exhibían armas de fuego. Una vez héchasle las advertencias copiadas al inicio de esta opinión, Antas relató los hechos, todo lo cual tomó aproximadamente una hora. Luego se llamó a de Jesús Cabrera, en presencia de Antas. Se le hicieron las advertencias, y al interrogarle, ofreció una versión de los hechos que le exoneraba, "él decía que quería declarar y daba una versión". Ante esta actitud, Antas le interpeló conminándole a que dijera la verdad, pero de Jesús persistió en

negar su participación en los hechos delictivos. Frente a esta situación Antas propuso que se visitara el lugar del crimen para demostrar que él sólo no podía haber cometido los asesinatos. Entre 2:30 y 3:00 P.M. llegaron al apartamiento de la víctima que se encontraba en las mismas condiciones en que estaba después de la realización de los delitos. Persistía la actitud "jovial y simpática" de ambos sospechosos. Al llegar el fiscal observó dos inscripciones en la pared que leían "La Mafia" y comentó que las letras eran distintas. Entonces de Jesús llamó aparte al fiscal, le echó los brazos, diciéndole "Yo confío en usted y le voy a decir la verdad". Regresaron a la habitación, y cuando Antas comenzó a escenificar lo ocurrido, de Jesús se ocultó tras un ropero, explicando que ésa era la posición que había asumido por indicaciones de Antas. Luego ambos explicaron en detalle su participación en los actos que resultaron en la muerte de Fisher y Sánchez. Durante el curso de la escenificación se tomaron fotografías para las cuales los acusados posaron voluntariamente. Al regresar al cuartel, alrededor de las 5:00 P.M., se les tomaron las confesiones escritas.

José D. Feliciano, empleado del diario *El Mundo*, quien tomó unas fotografías de los acusados en el acto de la firma de las confesiones, declaró que éstos estaban "muy contentos, sonrientes, muy accesibles a contestar preguntas", y que al inquirir cómo habían sido tratados, respondieron que "muy bien, chévere".

Esta es en síntesis la prueba que tuvo ante sí el tribunal a quo sobre la voluntariedad de las confesiones. Los acusados no presentaron evidencia sobre el particular, a pesar de que el tribunal manifestó su disposición de oir cualquier prueba sobre este extremo, limitándose a formular objeción a su admisión fundándose en que el procedimiento para su toma estaba viciado por no habérseles conducido inmediatamente ante un magistrado después del arresto, y en cuanto a Antas,

por el motivo adicional de no habérsele hecho la advertencia sobre las consecuencias que le sobrevendrían "de ser encausado en un tribunal y en otro". Al resolver dijo el juez: "Todas las circunstancias que surgen de la prueba . . . han dejado satisfecho a este Tribunal, jurídica y espiritualmente, de que los acusados fueron tratados con el mayor respeto, con la mayor consideración y que se les garantizaron todos sus derechos. *Que sus declaraciones fueron absolutamente voluntarias, aunque esta cuestión no está planteada aquí*".

■ Es ahora, por primera vez en apelación, que se levanta que la confesión de Roberto de Jesús Cabrera está teñida de involuntariedad por haber sido obtenida mediante el ejercicio de presión sicológica. No obstante, independientemente de la conclusión hecha por el tribunal a quo, nos compete determinar a la luz de los hechos incontrovertidos y de las inferencias que de ellos surgen, si la confesión fue obtenida en la forma que se señala, *Pueblo* v. *Meléndez*, 80 D.P.R. 787 (1958). Las circunstancias antes relatadas no ofrecen margen para sostener tal afirmación. No es necesario compararlas con las otras situaciones más salientes en que hemos tenido oportunidad de examinar planteamientos similares— *Pueblo* v. *Fournier*, 77 D.P.R. 222 (1954) ; *Pueblo* v. *Meléndez*, supra; *Pueblo* v. *Pérez Martínez*, 84 D.P.R. 181 (1961) ; *Pueblo* v. *Martínez Figueroa*, 86 D.P.R. 413 (1962) ; *Pueblo* v. *Cruz Jiménez*, 87 D.P.R. 133 (1963)—para arribar a la conclusión de que no existe el más leve asomo que indique que a este apelante se le sometiera a presión de clase alguna, física o sicológica, para arrancarle una confesión. Si algo revela el récord es una extremada pulcritud del fiscal investigador y un desvelo notable por garantizar a los sospechosos un debido procedimiento de ley. El hecho de que originalmente de Jesús Cabrera negara participación *activa* en la comisión de los asesinatos y luego la admitiera no es índice por sí solo de que fuera coaccionado. El examen completo de

todas las circunstancias concurrentes, corroborado por sus expresiones en la confesión escrita posterior, demuestra que su declaración obedeció a dictados de su conciencia para librarle del grave peso que le oprimía por su actuación. Cf. *Pueblo* v. *Laguna Rodríguez*, 92 D.P.R. 831 (1965).

El otro apuntamiento básico de impugnación—la demora en conducirlos ante un magistrado—se diluye al considerar en conjunto todos los hechos. Precisa antes repetir lo expresado en *Pueblo* v. *Martínez Figueroa*, 86 D.P.R. 413 (1962), citando con aprobación de *Fournier* y *Meléndez*, supra, al efecto de que el fiscal puede interrogar a un presunto acusado, antes o después de su arresto, *durante un período razonable*, y que la detención por muchas horas por sí sola no es suficiente para viciar una confesión. A este respecto es necesario establecer un equilibrio deseable entre el reconocimiento que merecen los derechos del acusado y el valor social que representa la protección de orden público en el esclarecimiento de los actos delictivos. Todo cuanto requiere la Regla 6(b) es que una vez arrestada la persona se le conduzca "sin dilación innecesaria" ante un magistrado, según se reitera en la Regla 22(a) que se refiere a "demora innecesaria".

Del relato de los hechos aparece que a de Jesús Cabrera se le detuvo alrededor de las tres de la madrugada en relación con su participación *en otro delito*, desvinculado de los que consideramos, y que después de señalar a Antas como el agente responsable, solicitó protección, por lo cual se le recluyó. A Antas se le detuvo a las diez de la mañana. La investigación comenzó alrededor de mediodía. En el transcurso de la misma se obtuvieron las confesiones orales, después de visitar el lugar del crimen y escenificar los hechos. A las cinco de la tarde, al regresar al cuartel, se toman ambas confesiones escritas. Inmediatamente se somete el caso a un magistrado para la determinación de causa probable. No

puede sostenerse que se incurrió en "demora innecesaria". Considerada la naturaleza de la investigación y las gestiones realizadas cualquier llamada demora fue razonable para proporcionar a los funcionarios investigadores la oportunidad de estar en condiciones de someter el caso al magistrado.

■ 3. Finalmente, réstanos discutir el apuntamiento sobre el error señalado de que el tribunal de instancia no tomó en consideración la minoridad de Antas a los fines de determinar sobre la voluntariedad de sus confesiones.([2]) En *Gallegos* v. *Colorado*, 370 U.S. 49 (1962), que se invoca como autoridad, solamente se indica que la inmadurez del acusado —contaba catorce años— era *una circunstancia* a considerar para determinar sobre la voluntariedad de una confesión por lo que ello podría reflejar en cuanto a un conocimiento cabal de las consecuencias de admitir los hechos. Pero una lectura de la opinión dividida (4–3) revela que otros factores, como la prolongada detención de cinco días a que se le sometió, en ausencia de familiares y sin la oportunidad de un consejo más sazonado y maduro, fueron decisivos en la determinación de involuntariedad. En el presente caso la narración de los hechos demuestra que Antas tenía pleno conocimiento de las consecuencias de sus actos, y que no se trataba de un tierno e ignorante adolescente; la prueba revela que no era éste su primer encuentro con la ley. Véanse, *De Souza* v. *Barber*, 263 F.2d 470 (9th Cir. 1959), y *Olivera* v. *State*, 354 P.2d 792 (Okla. 1960).

Añádase a esto que conforme el Art. 4 de la Ley Núm. 97 de 23 de junio de 1955, 34 L.P.R.A. sec. 2004, la renuncia

---

([2]) Aparece que en el curso del interrogatorio a que fue sometido Antas aparentemente hizo referencia a su minoridad y alegadamente produjo una certificación de nacimiento que portaba para comprobarlo. No pudo establecerse con certeza la existencia del certificado. El fiscal Ortiz Ortiz declaró que intentó comunicarse infructuosamente con los jueces a cargo de los asuntos de menores y con abogados de la Sociedad de Asistencia Legal.

de jurisdicción se rige por el único criterio del bienestar del niño o de la comunidad. (³) Según se desprende de las únicas constancias obrantes en los autos la confesión prestada por el apelante no parece haber sido considerada por la Sala de Menores al emitir su resolución. (⁴)

Apuntamos, de paso, que para el incidente de renuncia de jurisdicción, el apelante tuvo la debida asistencia de abogado. *Kent* v. *United States*, 383 U.S. 541 (1966) ; *Welch,*

---

(³) La resolución del juez de menores dice en parte:

"Del conjunto de la prueba testifical y del expediente según ha sido apreciado por el Tribunal, aparece que luego del 2 de marzo de 1964 en que el Tribunal puso a prueba mediante resolución a esos efectos al menor bajo la custodia de su señora madre, luego de celebrarle vista. Se hizo imposible comenzar un programa al menor en interés de su rehabilitación debido a que abandonó el hogar de su señora madre desconociéndose su paradero, en cuyo lapso de tiempo contrajo matrimonio. No fue hasta la radicación de las nuevas faltas cometidas por el menor que se tuvo conocimiento de su paradero.

Según se desprende de los exámenes de personalidad y de los informes mencionados en los párrafos anteriores caracterizan a éste como una persona con serios conflictos o trastornos de personalidad, haciéndose necesario establecer controles sobre su conducta porque de lo contrario, podría resultar, la ausencia de controles en una amenaza al bienestar de la comunidad.

Por consiguiente; a tenor con las disposiciones del Artículo 4 de la Ley 97 del 23 de junio de 1955 y entendiendo que los recursos con que cuenta para establecer un programa en interés de la rehabilitación del menor que llegan bajo las disposiciones de la Ley 97, no podrían efectuarse cambios favorables en los problemas de conducta que este menor presenta; y dentro de las disposiciones de ley y los términos que ésta fija para poder efectuar dichos cambios a saber: hasta que el menor cumpla sus 21 años de edad; entendiendo el Tribunal además, que los problemas son de tal naturaleza que requieren que la comunidad sea protegida, más allá del menor haber alcanzado sus 21 años."

(⁴) No anticipamos criterio alguno sobre la situación en que el menor es conducido ante las autoridades que entienden en asuntos de delincuencia juvenil y se obtiene una confesión sin advertirle que la misma puede ser utilizada en un proceso criminal ordinario si el Tribunal de Menores, conforme a la ley, renuncia su jurisdicción. Véanse, *Harling* v. *United States,* 295 F.2d 161 (D.C. Cir. 1961) ; *In re Holmes,* 109 A.2d 523 (Pa. 1954) ; *Ex Parte Tahbel,* 189 Pac. 804 (Calif. 1920), Notas en 76 Harv. L. Rev. 108–111 (1962), 50 Calif. L. Rev. 902 (1962) ; 15 Ala. L. Rev. 234 (1962) y 31 U. Cinc. L. Rev. 454 (1962).

*Delinquency Proceedings—Fundamental Fairness for the Accused in a Quasi-Criminal Forum,* 50 Minn. L. Rev. 653 (1966); nota en 19 Vand. L. Rev. 1385 (1966); cf. *Application of Gault,* 407 P.2d 760 (1965), pendiente ante el Tribunal Supremo federal, 34 U.S.L. Week 3428 (1966).

*No habiéndose cometido los errores señalados, se confirmarán las sentencias dictadas por el Tribunal Superior, Sala de San Juan, en 19 de febrero de 1965.*

El Juez Presidente Señor Negrón Fernández y el Juez Asociado Señor Rigau no intervinieron.